UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

Ira K. Gross
SULLIVAN & WORCESTER LLP
One Post Office Square
Boston, MA 02109
(617) 338-2800 (phone)
*Attorneys for Plaintiff*




| | |
|---|---|
| CHRISTINA ELWELL,<br>    Plaintiff,<br><br>v.<br><br>GOOGLE, INC. and<br>TIMOTHY ARMSTRONG,<br>    Defendants. | Civil Action No: |

## COMPLAINT

Plaintiff Christina Elwell ("Elwell"), by her attorneys, complains of the Defendants Google, Inc. ("Google") and Timothy Armstrong ("Armstrong"), as follows:

### Parties

1.    Plaintiff Christina Elwell is a natural person residing at 530 West End Avenue, New York, New York 10024.

2.    Defendant Google, Inc. is a corporation organized under the laws of the state of Delaware, with a place of business at 1440 Broadway, New York, New York 10018.

3.    Defendant Timothy Armstrong is a natural person who resides in Connecticut. Armstrong is employed as Google's Vice President for National Sales and commutes to and works primarily out of Google's offices at 1440 Broadway, New York, New York.

## Jurisdiction and Venue

4. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1332, and 1367.

5. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b), as a substantial part of the events giving rise to the claims herein occurred in this District.

## Facts

6. Google hired Elwell in 2000 to a high-level position within Google's sales force. At all times during Elwell's employment with Google, Elwell was highly successful and well-regarded by Google executives and managers. At all times during her employment with Google, Elwell reported to Armstrong.

7. In late 2003, Armstrong promoted Elwell to the position of National Sales Director. In that position, Elwell managed the North American sales force of Google.

8. In February 2004, Elwell became pregnant with quadruplets.

9. At a meeting of the entire Google sales force in early 2004 at which Google's upcoming initial public offering was announced, Armstrong singled out Elwell to acknowledge that her personal efforts had made a significant contribution to the strength of the sales force and to Google's ability to go public.

10. In late April 2004, Elwell told Armstrong that she was pregnant with quadruplets and that she was having medical problems associated with the pregnancy. Elwell told Armstrong that she could not travel for a few weeks because of her medical problems. Armstrong asked Elwell several times whether she would be willing to resume traveling after giving birth. Elwell told Armstrong that she would. Elwell also discussed with Armstrong a plan to cover her travel responsibilities while her travel was restricted.

{B0419204; 5}

11. In May 2004, Elwell lost two of her unborn children. Armstrong knew of this loss.

12. On May 27, 2004, Armstrong showed Elwell an organizational chart from which Elwell's position had been deleted. Armstrong then told Elwell that he wanted to transfer her to a position in Google's operations department that had virtually no relationship to her former sales position, no direct tie to sales revenue, no management responsibilities, and did not in any way use Elwell's 15 years of sales experience. At the time of this conversation, Google's Board of Directors already had refused Armstrong permission to create the operations position. The operations position would have constituted a significant demotion for Elwell.

13. Armstrong told colleagues of Elwell that he was moving her into the operations position because she could not travel.

14. Elwell offered instead to accept a demotion to the position of Director of East Coast sales, which would allow her to travel by train and car. Armstrong initially agreed to this arrangement, but almost immediately thereafter changed his mind. Armstrong subsequently promoted to the sales position a man whom Elwell herself had recently hired, who had no internet sales experience, and who was less qualified for the position than Elwell.

15. On June 4, 2004, Armstrong called Elwell into his office and told her that she was "an HR nightmare" and that he no longer wanted her in the New York office. Armstrong accused Elwell of talking to others at Google about her situation. Elwell acknowledged that she had discussed with some peers the operations position that Armstrong wanted to move her into and that she had expressed concern that she was being moved into the position because of her pregnancy.

16. On June 5, 2004, Armstrong called Elwell and fired her over the telephone. Armstrong told Elwell that he had a "gut feeling" that it was "the right thing to do," that Elwell "did not understand the direction the company was taking," and that she "had spoken to others."

17. In an effort to salvage her employment with Google, Elwell offered to accept the demotion to the operations job that Armstrong had previously discussed with her. Armstrong refused and told Elwell that she should call Charles Gray ("Gray"), an employee in Google's Human Resources Department, tell him that she had been fired, and get a severance package.

18. On June 11, 2004, Armstrong sent an e-mail to the Google sales force announcing that Elwell was leaving the company.

19. Elwell called Gray and told him that she had been fired. Gray and Elwell engaged in substantive severance discussions, after which Gray told Elwell that he was putting a written severance agreement into the overnight mail to her. Gray did not send Elwell any agreement.

20. During this period, Elwell was in danger of losing another of her unborn children.

21. On June 22, 2004, Shona Brown ("Brown"), an executive in Google's California headquarters, sent an e-mail to Elwell's husband accusing him of acting under "false pretenses" by telling Google that Elwell was having a "health crisis." Brown then offered Elwell "reinstatement" to the operations position that Armstrong had previously tried to convince Elwell to take. Brown attached to her e-mail a job description for that position. The position outlined in that job description had even fewer responsibilities and was more junior than the one Armstrong had originally described to Elwell.

22. On June 23, 2004, Stacy Sullivan ("Sullivan"), the Director of Google's Human Resources department, called Elwell's husband and told him that Elwell had been fired improperly. On June 24, 2004, Sullivan spoke with Elwell and told her the same thing.

23. On June 29, 2004, Elwell lost the third of her unborn quadruplets.

4

{B0419204; 5}

24. Desperate to preserve her employment with Google, Elwell accepted the demotion to the operations position that Brown had described. In late June 2004, Elwell made numerous attempts to meet with Armstrong to discuss the position. Armstrong eventually agreed to meet in mid-July. At the meeting, Armstrong told Elwell that she had been rehired because "it's good for Google." He told Elwell that, if she took the position, she would have no direct reports and would no longer attend directors meetings.

25. The position described by Armstrong constituted even more of a demotion than the position described in Brown's e-mail. Armstrong told Elwell that the sales directors and several regional sales managers at Google did not trust her. Armstrong told Elwell that if she still wanted the job, she should report to work on Monday, July 19, 2004.

26. Armstrong also told Elwell that, if she returned to Google, she would be on a performance improvement plan for six months, despite the fact that Armstrong had always praised Elwell's work performance.

27. After his meeting with Elwell, Armstrong told a colleague of Elwell that there was only a "slim chance" that Elwell would ever return to work and that he hoped that Elwell would not return.

28. Elwell returned to work on July 19. Armstrong assigned her to a project similar to those given to summer interns. Armstrong assigned Elwell to sit in a cubicle in a remote location in the office. At a national sales meeting later that day (a meeting that Elwell formerly ran), Armstrong refused to acknowledge Elwell. Elwell was humiliated in front of the sales force that she had managed just weeks earlier.

29. Armstrong alternately ignored and was rude to Elwell throughout the following two days. For example, when Armstrong saw Elwell's colleagues greeting her, he asked one of them whether Elwell was working or "just talking to people." Armstrong then said that he was

5

{B0419204; 5}

"uncomfortable" having Elwell in the office and that it would be better if Elwell left and worked from home.

30. On Wednesday, July 21, 2004, Elwell's doctor ordered her to remain out of work due to the stressful circumstances created by Google and Armstrong, which were putting her already high-risk pregnancy at further risk. Elwell notified Google that she required a disability leave of absence.

31. On or about August 18, 2004, Elwell filed a complaint of discrimination with the United States Equal Employment Opportunity Commission ("EEOC").

32. Shortly thereafter, Elwell received a check from Google for commissions owed to her for the second fiscal quarter of 2004. The commission payment was substantially less than Elwell was entitled to receive. Google told Elwell, through counsel, that the payment was lower than previous quarters because it was based in part on her performance rating for the quarter. For the second quarter of 2004, Armstrong had assigned Elwell a lower rating than she ever had received during her employment with Google.

33. While on disability leave, Elwell gave birth to the one child who had survived her pregnancy.

34. In January 2005, following her maternity leave, Elwell was prepared and anxious to return to her former position at Google. Google notified Elwell, however, that if she returned to work, she would be required to take the low-level operations position that Armstrong had forced her into in July. This demotion was intolerable to Elwell. As a result, she refused the position and was thus constructively discharged from her employment with Google.

35. On May 18, 2005, the EEOC issued Elwell a Notice of Right to Sue.

## Count I
### (Employment discrimination under Title VII, against Google and Armstrong)

36.     Elwell restates the allegations in Paragraphs 1 through 35 and incorporates them by reference herein.

37.     Despite Elwell's exemplary performance of her job and her qualifications, Armstrong and Google subjected Elwell to the adverse employment actions described herein. Defendants did so because of Elwell's pregnancy and sex.

38.     Google's and Armstrong's actions constitute illegal discrimination under Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991, 42 U.S.C. § 2000e et seq. ("Title VII").

39.     Google's and Armstrong's actions caused harm to Elwell.

## Count II
### (Retaliation under Title VII, against Google and Armstrong)

40.     Elwell restates the allegations in Paragraphs 1 through 39 and incorporates them by reference herein.

41.     Elwell engaged in activity that is protected by Title VII.

42.     Google and Armstrong retaliated against Elwell by their actions described herein.

43.     Google's and Armstrong's actions constitute illegal retaliation under Title VII.

44.     Google's and Armstrong's actions caused harm to Elwell.

## Count III
### (Discrimination under the New York State Human Rights Law, against Google and Armstrong)

45.     Elwell restates the allegations in Paragraphs 1 through 44 and incorporates them by reference herein.

46. Elwell's pregnancy constituted a disability under the New York State Human Rights Law, N.Y. Exec. Law § 290 et seq. ("NYSHRL").

47. Google's and Armstrong's actions constitute sex, pregnancy and disability discrimination under the NYSHRL.

48. Google's and Armstrong's actions caused harm to Elwell.

## Count IV
**(Retaliation under New York State Human Rights Law, against Google and Armstrong)**

49. Elwell restates the allegations in Paragraphs 1 through 48 and incorporates them by reference herein.

50. Google's and Armstrong's actions constitute illegal retaliation under the NYSHRL.

51. Google's and Armstrong's actions caused harm to Elwell.

## Count V
**(Aiding and abetting discrimination and retaliation under the New York State Human Rights Law, against Armstrong)**

52. Elwell restates the allegations in Paragraphs 1 through 51 and incorporates them by reference herein.

53. Armstrong was aware of and knowingly participated in Google's discriminatory and retaliatory actions toward Elwell. Armstrong's conduct constitutes aiding and abetting Google's illegal conduct under the NYSHRL.

54. Armstrong's actions caused harm to Elwell.

## Count VI
**(Employment discrimination under the New York City Human Rights Law, against Google and Armstrong)**

55. Elwell restates the allegations in Paragraphs 1 through 54 and incorporates them by reference herein.

56.    Elwell's pregnancy constituted a disability under the New York City Human Rights Law, Administrative Code of the City of New York, § 8-101 et seq. ("NYCHRL").

57.    Google's and Armstrong's actions constitute sex, pregnancy and disability discrimination under the NYCHRL.

58.    Google's and Armstrong's actions caused harm to Elwell.

### Count VII
**(Retaliation under the New York City Human Rights Law, against Google and Armstrong)**

59.    Elwell restates the allegations in Paragraphs 1 through 58 and incorporates them by reference herein.

60.    Google's and Armstrong's actions constitute illegal retaliation under the NYCHRL.

61.    Google's and Armstrong's actions caused harm to Elwell.

### Count VIII
**(Aiding and abetting discrimination and retaliation under the New York City Human Rights Law, against Armstrong)**

62.    Elwell restates the allegations in Paragraphs 1 through 61 and incorporates them by reference herein.

63.    Armstrong's conduct constitutes aiding and abetting Google's illegal conduct under the NYCHRL.

64.    Armstrong's actions caused harm to Elwell.

### Count IX
**(Intentional infliction of emotional distress, against Armstrong)**

65.    Elwell restates the allegations in Paragraphs 1 through 64 and incorporates them by reference herein.

66.    Armstrong's conduct was extreme and outrageous.

{B0419204; 5}

67. Armstrong acted with an intent to cause, or in disregard of the substantial probability of causing, severe emotional distress.

68. As a result of Armstrong's conduct, Elwell suffered severe emotional distress.

### Count X

#### (Intentional interference with contractual or advantageous business relations, against Armstrong)

69. Elwell restates the allegations in Paragraphs 1 through 68 and incorporates them by reference herein.

70. Elwell had a valuable employment relationship with Google.

71. Armstrong knew of the employment relationship between Google and Elwell, and intentionally acted in such a way as to cause Google to end that relationship.

72. Armstrong interfered with Elwell's employment relationship for a malicious and improper purpose.

73. Armstrong's conduct caused harm to Elwell.

WHEREFORE, Plaintiff Christina Elwell respectfully requests that the Court, after trial,

A. award her compensatory damages, in an amount to be determined at trial, to compensate her for back pay, all lost benefits of employment (including, but not limited to, the lost value of her unvested stock options), and emotional distress;

B. award her punitive damages, in an amount to be determined at trial;

C. award her attorneys' fees, costs, and interest;

D. award her such other and further relief as this Court deems just and appropriate under the circumstances.

{B0419204; 5}

**JURY TRIAL DEMANDED**

        CHRISTINA ELWELL,

        By her attorneys,

        _/s/ Ira K. Gross_
        Ira K. Gross (IG 6834)
        SULLIVAN & WORCESTER LLP
        One Post Office Square
        Boston, MA 02109
        (617) 338-2800 (phone)
        (617) 338-2880 (fax)
        igross@sandw.com

Dated: July 18, 2005