UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------- x

CHRISTINA ELWELL,

                  Plaintiff,

    -against-

GOOGLE, INC. and TIMOTHY
ARMSTRONG,

               Defendants.

------------------------------------------------------------- x

**05-CV-06487 (DLC) (JCF)**

**ECF CASE**

## PLAINTIFF'S MEMORANDUM IN SUPPORT
## OF HER MOTION TO LIFT THE LITIGATION STAY

Ira K. Gross (IG 6834)
Ilene Robinson Sunshine (IS 2935), *pro hac vice*
Barry S. Pollack (BP 4039)
Joshua L. Solomon (JS 5848), *pro hac vice*
SULLIVAN & WORCESTER LLP
One Post Office Square
Boston, MA 02109
(617) 338-2800 (phone)
(617) 338-2880 (fax)
*Counsel for Plaintiff*

## TABLE OF CONTENTS

Table of Authorities ............................................................................................................. ii

I.      Introduction ........................................................................................................... 1

II.     Factual Background ................................................................................................ 1

III.    Procedural History ................................................................................................ 2

IV.     Legal Standard ....................................................................................................... 5

V.      Argument ............................................................................................................... 5

        A.      New Evidence Proves That The Arbitration Clause Does Not
                Apply To Elwell's Claims ........................................................................... 5

        B.      New Evidence Proves That the Arbitration Clause Is Unenforceable
                to the Extent it Would Otherwise Reach Elwell's Employment Claims ............. 10

        C.      Assuming *Arguendo* That Defendants Ever Possessed
                Arbitration Rights, They Have Since Waived Those Rights
                Through Their Misuse of the Arbitral Forum ..................................................... 15

VI.     Conclusion ............................................................................................................. 20

## TABLE OF AUTHORITIES

### Federal Cases

Doctor's Associates v. Casarotto, 517 U.S. 681 (1996) ...................................................10

Gilmer v. Interstate/Johnson Lane Corp., 500 U.S. 20 (1991) .....................................18

Mannick v. Kaiser Foundation Health Plan, Inc., No. C 03-5905 PJH,
    2005 WL 3454134 (N.D. Cal. Dec. 16, 2005) .........................................................7

Sims v. Montell Chrysler, Inc., 317 F. Supp. 2d 838 (N.D. Ill. 2004) ..........................14

Velco Chems., Inc. v. Oltchim, S.A., No. 99 Civ. 11794 (LMM),
    2002 WL 15645 (S.D.N.Y. Jan. 4, 2002) ...............................................................5

### State Cases

Abramson v. Juniper Networks, Inc., 115 Cal. App. 4th 638 (2004) .............................10, 11, 12,
    13, 14

Armendariz v. Foundation Health Psychcare Services, Inc., 24 Cal. 4th 83 (2000) ....................13

Byrne v. Laura, 52 Cal. App. 4th 1054 (1997) ..............................................................14

National City Police Officers' Association v. City of National City,
    87 Cal. App. 4th 1274 (2001) ..................................................................................9

### State Statutes

Cal. Civil Code § 1647.....................................................................................................7

## I.    INTRODUCTION

Plaintiff Christina Elwell ("Elwell") respectfully moves this Court for an order lifting the stay of litigation presently in place in this action. This motion is based on changed circumstances since the Court imposed the stay in response to a motion to compel arbitration filed by defendants Google, Inc. ("Google") and Timothy Armstrong ("Armstrong," and together with Google, "Defendants"). Specifically, Defendants have produced key documents in discovery demonstrating that Elwell's claims are not subject to arbitration, contrary to Defendants' arguments to this Court. In addition, even if Defendants possessed contractual rights to arbitration when this Court compelled arbitration, Defendants have now waived those rights by their conduct in the arbitration proceedings thus far. Elwell thus respectfully requests that the Court lift the stay of litigation and permit her claims to proceed before this Court.

## II.    FACTUAL BACKGROUND

In 2000, Elwell was hired by Google and signed the "Google Inc. Employment, Confidential Information and Invention Assignment Agreement" (the "Confidentiality Agreement"), on which this Court based its January 30, 2006 Order compelling arbitration. During discovery, Elwell obtained documents that place the Confidentiality Agreement in context and confirm that it served only as a confidentiality and intellectual property agreement, and not an "employment agreement" as Defendants described it in their motion to compel arbitration.

Upon signing the employment documentation, Elwell began working as a high-level Google employee. At the time of the events at issue in this case, Elwell was Google's National Sales Director and was responsible for managing Google's North American sales force. Armstrong is Google's Vice President for Advertising Sales and was Elwell's supervisor during her entire tenure with Google. Armstrong promoted Elwell, and consistently gave her

performance high marks on Google's numerical rating scale, which was reflected in Elwell's

performance-based compensation and in several awards of Google stock options. At various

points during Elwell's employment, Armstrong referred to her as his "right-hand" person, and

said that he could not do his job without her.

In late April 2004, just months before Google's initial public offering, Elwell informed

Armstrong that she was pregnant with quadruplets, and that her ability to travel might be

restricted during her high-risk pregnancy. Armstrong's treatment of Elwell did an immediate

about-face. Within weeks, he had stripped Elwell of her position and duties, and reassigned her

to a newly created, undefined operations position with no substantive responsibility. Elwell, who

had been a sales person for her entire career, recognized that this reassignment to an operations

position was make-work and expressed her concern that Armstrong had changed her position

because she was pregnant. Armstrong immediately retaliated against Elwell for expressing her

concern about pregnancy discrimination, calling her an "HR nightmare" and then firing her.

Other Google executives, including Eric Schmidt, Google's CEO, soon learned of

Elwell's firing and her allegation of pregnancy discrimination. Google's executive team

attempted to mitigate the company's liability by purporting to reinstate Elwell, and then

attempting to engineer her "voluntary" resignation. In pursuit of that end, Armstrong and these

other executives took a variety of steps designed, in the words of one human resources official

involved, to "forc[e] this into a resignation." These efforts were ultimately successful in pushing

Elwell out of the company, leading to her constructive discharge in February 2005.

### III.  PROCEDURAL HISTORY

After receiving a right to sue letter from the Equal Employment Opportunity

Commission, Elwell brought this action, in which she asserts claims for employment

discrimination and retaliation, aiding and abetting discrimination and retaliation, intentional

infliction of emotional distress, and interference with contractual and advantageous relations. Rather than answering the complaint, Defendants moved to compel arbitration. In support of that motion, Defendants presented the Court with the Confidentiality Agreement, which Elwell had signed when she joined Google in 2000. While the Confidentiality Agreement did not address claims of the type Elwell brought, Defendants asserted that because the Confidentiality Agreement was Elwell's "employment agreement," any claims concerning her employment were subject to that agreement's arbitration provision.

Elwell opposed Defendants' motion on the ground that the Confidentiality Agreement's arbitration provision did not apply to her discrimination, retaliation, and tort claims. She suspected that Google possessed, but was withholding, other documents that constituted Elwell's actual employment agreement and that would put the Confidentiality Agreement into proper context. Elwell argued that such documents would likely demonstrate that the Confidentiality Agreement was a separate, discrete agreement focused only on confidentiality and intellectual property obligations, and was not her global "employment agreement" as Defendants had characterized it so as to shoehorn Elwell's claims into the arbitration provision. In making this argument, Elwell was substantially disadvantaged, however, by not having access to her personnel file at Google.

In particular, Elwell lacked access to the documents necessary to put the Confidentiality Agreement into context and to prove that something else was her "employment agreement." Both in her opposition papers and in communications with Defendants' counsel, Elwell thus called on Google to produce such materials. Aware that doing so would undermine their motion to compel arbitration, Defendants refused such a production. In fact, they went so far as to chastise Elwell's opposition to their motion as invoking a "mystery document." <u>See</u> Defs' Reply

Br. in Support of Mot. to Compel, at 6. Defendants thus persisted in their representation to this Court that the Confidentiality Agreement *was* the document that governed Elwell's employment and, thus, that its arbitration clause covered all employment-related disputes. In January 2006, in reliance on the Confidentiality Agreement's arbitration clause, the Court granted Defendants' motion to compel arbitration. It stayed this action pending arbitration.

The parties proceeded to arbitration as directed by the Court. During discovery, Defendants finally produced the materials they had withheld when moving to compel arbitration. Included among those documents was Elwell's actual employment agreement, in the form of an offer letter signed by Google and countersigned by Elwell. As discussed below, these documents confirmed Elwell's earlier suspicion. That is, they demonstrated that the Confidentiality Agreement was *not* the global "employment agreement" that Defendants had described to the Court, and thus does not encompass the claims in this case. Indeed, viewed in the context of the documents that Defendants have now produced, the Confidentiality Agreement's arbitration clause would be facially unenforceable as a matter of law if viewed as a provision in a general employment agreement.

In addition, Defendants have repeatedly sought to delay resolution of Elwell's claims throughout the arbitration proceedings. By seeking the latest possible hearing date, continually demanding all of the procedures that would apply in a judicial forum, and threatening to return to Court if the arbitrator did not adopt their position on procedural matters, Defendants have essentially converted the arbitration into a full-scale litigation. As such, they have behaved in a manner that is inconsistent with the very nature of arbitration, and have thus waived any contractual rights to arbitration that they may have possessed.

Because of the changed circumstances stemming from, among other things, Defendants' tardy production of documents and Defendants' conduct during the arbitration, Elwell brings this motion to lift the stay of litigation and to permit the case to proceed before this Court, where Elwell can be afforded her right to a jury trial in this civil rights action.

## IV.   LEGAL STANDARD

"Courts may terminate, dissolve, vacate or modify an interlocutory order in the event that changed circumstances require it. . . . [B]ecause the stay is an interlocutory order, the Court has broad discretion to evaluate changed circumstances since the stay was imposed." Velco Chems., Inc. v. Oltchim, S.A., No. 99 Civ. 11794 (LMM), 2002 WL 15645, at *2 (S.D.N.Y. Jan. 4, 2002) (internal quotation marks omitted).

## V.   ARGUMENT

**A.    New Evidence Proves That The Arbitration
Clause Does Not Apply To Elwell's Claims**

The true nature of the Confidentiality Agreement came to light during discovery in the arbitration proceeding. In response to document requests, Defendants produced several documents demonstrating that the Confidentiality Agreement is of limited scope, and *not* a general employment agreement, as Defendants represented it to be in their motion to compel arbitration. More specifically, the new documents demonstrate that Elwell entered into a *separate*, broader agreement that constitutes her actual employment agreement. The actual employment agreement not only governs the terms of her employment generally, but it also makes clear by reference to the Confidentiality Agreement that the Confidentiality Agreement is simply a discrete agreement designed merely to impose particular restrictions on Google employees with respect to Google's intellectual property – restrictions that are wholly unrelated to Elwell's claims in this case.

5

To accept her position with Google in September 2000, Elwell was required to sign the Confidentiality Agreement. That Agreement contains an arbitration provision, which includes the following language: "I agree that any dispute or controversy arising out of or relating to any interpretation, construction, performance or breach of *this Agreement*, shall be settled by arbitration . . . ." Confidentiality Agreement ¶ 10(a), attached as <u>Exhibit A</u> to Declaration of Joshua L. Solomon, filed herewith ("Solomon Decl.") (emphasis added). Thus, the arbitration provision applies only to disputes that arise out of or relate to the Confidentiality Agreement itself.

In their motion to compel arbitration, however, Defendants depicted the Confidentiality Agreement as Elwell's "Employment Agreement," so as to fit Elwell's claims into the phrase "this Agreement." In fact, Defendants went so far as to claim that the Confidentiality Agreement reached "into virtually every aspect of [Elwell's] employment." Defs' Reply in Support of Mot. to Compel Arbitration, at 4. Defendants recognized that this sleight of hand hinged on characterizing the Confidentiality Agreement as a general employment agreement. They thus presented the Confidentiality Agreement to the Court in isolation, without the accompanying materials that Elwell signed upon accepting employment with Google. Defendants did so despite Elwell's request that they also provide the Court with those other materials. When Defendants declined to provide those materials, the Court was left with just the Confidentiality Agreement, unaccompanied by anything else that could constitute Elwell's "employment agreement," or otherwise put the Confidentiality Agreement into context. Based on this showing, the Court found that the Confidentiality Agreement was Elwell's employment agreement, which in turn led to the conclusion that the arbitration clause applied to *all* disputes concerning Elwell's employment.

Elwell respectfully requests that the Court now look at and interpret the Confidentiality

Agreement and its arbitration provision in context. See Mannick v. Kaiser Found. Health Plan,

Inc., No. C 03-5905 PJH, 2005 WL 3454134, at *4 (N.D. Cal. Dec. 16, 2005) ("In determining

whether a particular dispute is subject to arbitration, the contract should be read as a whole.

Even if broadly drafted, however, an arbitration clause does not apply to disputes unrelated to

matters covered in the contract."); see also Cal. Civ. Code § 1647 ("A contract may be explained

by reference to the circumstances under which it was made, and the matter to which it relates.").[1]

The primary document that puts the Confidentiality Agreement in context is Elwell's offer letter,

which both Elwell and Google signed, and which constitutes her employment agreement (a copy

of the offer letter is attached as Exhibit B to the Solomon Decl.). The offer letter sets forth the

key terms of Elwell's employment, including her position, salary, stock option grants, target

annual earnings, reporting relationship, immigration requirements, benefits, and terms of

acceptance. The offer letter also refers to "Google's Employee Handbook," which is described

as setting forth Google's "policies and procedures," and which thus provides additional terms of

Elwell's employment. The letter, which is signed by a Google officer, further states that Elwell

is to countersign the letter to accept the terms of employment that Google was offering. Elwell

countersigned the letter, creating an employment agreement. Importantly, the offer letter does

*not* include an arbitration provision.

The offer letter also states that Elwell must sign the Confidentiality Agreement, and

describes the nature of that agreement (emphasis added):

> You will also be expected to sign and comply with an Employment, Confidential
> Information, Invention Assignment Agreement, which requires, among other

---

[1] The Confidentiality Agreement contains a choice of law provision selecting California law.

provisions, *the assignment of the patent rights to any invention made during your employment at Google and non-disclosure of the proprietary information.*

Then, on the signature page, the letter states (emphasis added):

I further understand that my signature is required on a Google Incorporated *Confidentiality and Invention Agreement* as a condition of employment on my first day of employment.

Particularly when viewed in the context of the offer letter, which is itself the contract that governs the terms of Elwell's employment generally, the Confidentiality Agreement cannot realistically be described as Elwell's "employment agreement." In contrast to the mutually signed offer letter, the Confidentiality Agreement is not signed by a Google official, and contains no mention of such fundamental terms of employment as salary, benefits, job duties, reporting relationship, or even Elwell's position with Google. In short, the Confidentiality Agreement is not, and never purports to be, a global "employment agreement" governing Elwell's entire relationship with Google. To the contrary, it is nothing more than a set of confidentiality and intellectual property restrictions imposed on Elwell "as a condition of employment." Thus, the reference in the Confidentiality Agreement's arbitration provision to disputes arising out of or relating to "this Agreement" is not so broad as to encompass all possible disputes concerning Elwell's employment. Rather, it covers only disputes concerning the Confidentiality Agreement itself. For an arbitration provision to encompass such claims as illegal discrimination and retaliation, such a provision would have had to appear in Elwell's actual employment agreement (i.e. the offer letter that Defendants have now produced).

In addition, another document that Defendants produced following the Court's Order compelling arbitration demonstrates that the arbitration provision in the Confidentiality Agreement was not sufficient to waive Elwell's right to a judicial forum and a jury trial. In fact, this document demonstrates that Defendants themselves recognized the need for the arbitration

provision to appear in the offer letter if it was to apply to all employment-related claims. Specifically, along with the offer letter that Elwell signed in 2000, Defendants produced a second, draft offer letter that they apparently planned to present to Elwell in 2004 when they demoted her (the second offer letter is attached as Exhibit C to the Solomon Decl.).[2] That second letter, which Elwell did not receive until discovery in the arbitration proceeding, and *which Elwell never signed*, contained an arbitration provision. Such a provision did *not* appear in the 2000 offer letter that Elwell actually signed. The second letter thus reflects an acknowledgement by Google that arbitration of all employment-related disputes would require placement of the arbitration provision in Elwell's actual employment agreement, rather than just in the Confidentiality Agreement.[3]

These documents, and particularly the offer letter that Elwell signed to accept employment with Google, should have been provided to the Court along with Defendants' motion to compel, especially after Elwell noted that the Confidentiality Agreement was likely being presented out of context. Yet Defendants not only refused to do so, but in their briefing to this Court, they criticized Elwell's brief for invoking a "mystery document" and for referencing "a hypothetical document to which the [Confidentiality] Agreement was purportedly attached." See Defs' Reply Br. in Support of Mot. to Compel, at 6. The documents at issue were, of course,

---

[2] Defendants produced this document to Elwell with a "confidential" designation under a protective order that the arbitrator issued. The terms of that order require Elwell to seek permission from this Court to file the document under seal. Elwell is thus filing a motion to permit that document to be filed under seal. Thus, the second offer letter is not attached to the version of the Solomon Declaration that Elwell is filing with this memorandum. Elwell will file a supplemental copy of the declaration, attaching the second offer letter, once the Court rules on the motion to permit filing under seal.

[3] In addition to reflecting Google's acknowledgment of that fact, the inclusion of an arbitration provision in one document, but not in an earlier document of the same type, suggests that the subsequent document was meant to add a *new* term. Any other reading would render the newly added language surplusage. See National City Police Officers' Assn. v. City of National City, 87 Cal. App. 4th 1274, 1279 (2001) ("An interpretation which renders part of the instrument to be surplusage should be avoided." (internal quotation marks and editing omitted)).

no mystery to Defendants. They possessed them, but withheld them so as to bolster their

depiction of the Confidentiality Agreement as Elwell's "employment agreement."

**B.    New Evidence Proves That the Arbitration Clause Is Unenforceable
to the Extent it Would Otherwise Apply to Elwell's Employment Claims**

There is yet another reason, in light of Defendants' newly produced documents, to read

the Confidentiality Agreement's arbitration provision as applying only to those matters actually

addressed in that agreement. The Confidentiality Agreement states that it is governed by

California law. Thus, in assessing the enforceability of the arbitration provision, the Court must

look to California contract law for any possible bars to enforcement. See Doctor's Assocs. v.

Casarotto, 517 U.S. 681, 687 (1996). California law would not permit the arbitration clause to

have any effect if that clause were read as being a provision in Elwell's overall employment

agreement. Thus, the only way to preserve the arbitration provision's validity is to read it as *not*

applying to all employment claims, but rather only to claims within the scope of the

Confidentiality Agreement. Alternatively, if the Court feels compelled to read the arbitration

provision as broad enough to encompass all employment claims, California law would compel

the conclusion that the provision is unenforceable as a matter of state contract law.

Under California law, arbitration provisions in employment agreements are

unenforceable where they are procedurally and substantively unconscionable. See Abramson v.

Juniper Networks, Inc., 115 Cal. App. 4th 638, 655-56 (2004). An arbitration provision is

procedurally unconscionable where it is oppressive as a result of it being adhesive. A contract

will be deemed adhesive if it was entered into in "a set of circumstances in which the weaker or

'adhering' party is presented a contract drafted by the stronger party on a take it or leave it

basis." Id. at 662 (internal quotation marks omitted). Put another way, where there is an

inequality of bargaining power and the absence of any real choice with respect to an arbitration

provision, the provision will be deemed oppressive and procedurally unconscionable. Id. at 662-63. Furthermore, a party's "ability to negotiate other aspects of his employment with [the employer] has no bearing on the question of whether he had power to negotiate the *arbitration* provision." Id. at 662 (emphasis in original).

The new documents that Defendants refrained from producing until after they succeeded on their motion to compel arbitration make clear that the arbitration provision at issue is procedurally unconscionable under controlling California law. As mentioned above, the offer letter that Defendants produced during discovery states that Elwell "will also be *expected* to sign and comply with [the Confidentiality Agreement]" (emphasis added). That directive is repeated on the offer letter's signature page: "I further understand that my signature *is required* on a Google Incorporated Confidentiality and Invention Agreement as *a condition* of employment on my first day of employment" (emphasis added). The offer letter thus demonstrates that the Confidentiality Agreement was a form Google document that Elwell was required to sign upon beginning work with Google. Furthermore, the dates of Elwell's signatures on the offer letter and the Confidentiality Agreement show that Elwell did sign the Confidentiality Agreement after she had already entered into an employment relationship with Google by signing the offer letter, as she was required to do to begin working. The Confidentiality Agreement, which contains the arbitration provision at issue, is a contract of adhesion and satisfies California's concept of procedural unconscionability.

As for substantive unconscionability, there can be little dispute that the arbitration provision is unconscionable under California law. In Abramson, the California Court of Appeal found that a virtually identical arbitration provision was substantively unconscionable (that the two provisions are nearly identical is no coincidence, as the defendant's law firm in Abramson,

11

Wilson Sonsini Goodrich & Rosati, is Defendants' counsel here, and Marina C. Tsatalis of

Wilson Sonsini litigated for the employers in both cases).  As the Abramson court explained,

"the paramount consideration is mutuality" when assessing the substantive unconscionability of

an employment arbitration agreement.  Id. at 664.  The court went on to conclude that the

arbitration provision before it failed the mutuality test because it required the plaintiff/employee

to arbitrate, while permitting the defendant/employer to bring claims for injunctive relief in

court.  Id. at 665-66.  That arbitration provision read, in relevant part, as follows:

> Equitable Remedies.  *I agree* that it would be impossible or inadequate to measure
> and calculate the company's damages from any breach of the covenants set forth
> in sections 2, 3, and 5 herein.  Accordingly, *I agree* that *if I breach* any of such
> sections, *both parties* will have available, in addition to any other right or remedy
> available, the right to obtain an injunction from a court of competent jurisdiction
> restraining such breach or threatened breach and to specific performance of any
> such provision of ties [sic] agreement.  Both parties further agree that no bond or
> other security shall be required in obtaining such equitable relief.

Id. (emphasis added).[4]  The court concluded that while this provision might appear to give "both

parties" the right to seek injunctive relief from a court, that purported mutuality was illusory

when read in the context of the entire paragraph, and particularly such statements as "I agree"

and "if I breach."  Id. at 665.

Here, one need not even take the step of disregarding the "both parties" language.  While

the arbitration provision in the Confidentiality Agreement otherwise mirrors the Abramson

provision, the provision at issue here replaces the words "both parties" with "the Company,"

making it explicitly one-sided:

---

[4] In Abramson, there was also a second arbitration provision, in the employee's offer letter.  That provision
mandated arbitration, but included a carve-out for certain claims, for which only the company could "seek[]
injunctive relief from any court having jurisdiction."  Id. at 664 n.3.  That provision thus failed the mutuality test on
its face.

<u>Equitable Remedies</u>.  I agree that it would be impossible or inadequate to measure and calculate the Company's damages from any breach of the covenants set forth in Sections 2, 3, and 5 herein.  Accordingly, I agree that if I breach any of such Sections, *the Company* will have available, in addition to any other right or remedy available, the right to obtain an injunction from a court of competent jurisdiction restraining such breach or threatened breach and to specific performance of any such provision of the Agreement.  I further agree that no bond or other security shall be required in obtaining such equitable relief and I hereby consent to the issuance of such injunction and to the ordering of specific performance.

Confidentiality Agreement ¶ 10(b) (<u>Exhibit A</u> to Solomon Decl.) (emphasis added).

Because the arbitration provision was part of an adhesive contract, as evidenced by the offer letter, and because it is not mutual, interpreting the Confidentiality Agreement as an employment agreement would render the arbitration provision procedurally and substantively unconscionable, and thus unenforceable under <u>Abramson</u>.

Finally, the problems caused by reading the Confidentiality Agreement as a general employment agreement, and thus its arbitration provision as encompassing Elwell's employment claims, would be exacerbated by the fact that the arbitration provision also requires the employee to pay a portion of the arbitration fees.  <u>See</u> Confidentiality Agreement ¶ 10(a) (<u>Exhibit A</u> to Solomon Decl.).  That requirement is illegal under California law to the extent the arbitration provision is read as covering "public rights" claims, such as the employment discrimination and retaliation claims at issue here.  <u>Id.</u> at 661 (<u>citing</u> <u>Armendariz v. Foundation Health Psychcare Servs., Inc.</u>, 24 Cal. 4th 83 (2000)).  While the illegality of the fee provision may be of little importance if it stood alone, so long as Google is willing to pay all arbitration fees, the combination of the provision's two flaws – the illegality of the employee-pays requirement and the legal unconscionability – is significant under <u>Abramson</u>.  Specifically, the <u>Abramson</u> court held that where an employment arbitration provision is plagued by *both* of these flaws, the provision is too defective to be saved by severing the offending pieces.  Instead, a court must

strike down the arbitration provision in its entirety.  Id. at 667 ("The taint of illegality and unconscionability cannot be removed from this arbitration agreement by severing or restricting the objectionable terms.  The agreement thus is wholly unenforceable as a matter of law.").

The documents that are now available, but which Defendants withheld when moving to compel arbitration, thus allow for two possible treatments of the Confidentiality Agreement's arbitration clause with regard to Elwell's claims.  First, the Court could interpret the Confidentiality Agreement as just that – an agreement concerning confidentiality and intellectual property – and not as a global employment agreement impacting Elwell's entire employment relationship.  As such, that agreement's arbitration provision, which applies only to claims arising out of or relating to "this Agreement," would have no relevance to Elwell's claims.  This interpretation is most appropriate.  As discussed in part A above, it is consistent with the most logical reading of the agreement, once the agreement is read in the context of the documents that Defendants have now produced.  Moreover, such an interpretation remains true to the principle that courts are to interpret agreements so as to preserve their legal validity and enforceability. See Byrne v. Laura, 52 Cal. App. 4th 1054, 1070 (1997) ("[I]t is a fundamental rule of contractual construction that where two interpretations are reasonably permissible, courts will adopt that which renders a contract valid and effectual." (internal quotation marks omitted)). Alternatively, if the Court were to remain persuaded that the arbitration clause is broad enough to encompass Elwell's claims, then California law would render this procedurally and substantively unconscionable arbitration agreement unenforceable.  Either way, Elwell cannot be compelled to arbitrate her claims in this action.  See Sims v. Montell Chrysler, Inc., 317 F. Supp. 2d 838, 844 (N.D. Ill. 2004) ("If the arbitration clause proves to be unenforceable, then the Court naturally

will not maintain any stay of litigation in favor of an arbitration contemplated by a legally

defective clause.").

In short, the newly produced documents provide good cause for this Court to lift the

litigation stay. When the Court ordered that stay, Elwell lacked the evidence necessary to show

that another document constituted Elwell's actual employment agreement, that the

Confidentiality Agreement was not designed to serve as an overall "employment agreement" as

Defendants contended, and that the Confidentiality Agreement was a procedurally

unconscionable "take-it or leave-it" condition of Elwell's employment. Because Elwell had no

specific memory of the documents she signed back in 2000, and did not possess the documents

that Defendants eventually produced (see Declaration of Christina Elwell in Support of Mot. to

Lift Stay, filed herewith), her only available option was to request that Defendants provide the

full context for the document that they were offering to the Court. Defendants refused to do so,

aware that their best chance at denying Elwell a judicial forum was to suggest, on an incomplete

record, that the Confidentiality Agreement stood alone. The eventual production of those

documents marks a significant change in circumstances, demonstrates the inapplicability of the

arbitration provision on which Defendants rely, and warrants a lifting of the litigation stay.

**C.      Assuming *Arguendo* That Defendants Ever Possessed Arbitration Rights, They
         Have Since Waived Those Rights Through Their Misuse of the Arbitral Forum**

As discussed above, Elwell never agreed to arbitrate the claims she brought in this action.

Even were the Court to conclude that Defendants did possess contractual arbitration rights,

however, they have behaved throughout the arbitration in a manner inconsistent with those

rights. Defendants have thus waived any right to arbitration that they might have possessed.

At every turn, Defendants have attempted to delay resolution of Elwell's claims to as late

a date as possible. Defendants' delay tactics began with Defendants seeking the latest possible

date for a hearing on the merits. As a result of Defendants' consistent efforts in this regard, the arbitration hearing on Elwell's claims will now occur no earlier than February 2008 – *two years* after this Court stayed this litigation in favor of arbitration.

In an initial case management call, the arbitrator expressed her desire to conclude the arbitration within one year. Toward that end, the arbitrator set a tentative case schedule with an arbitration hearing beginning on June 18, 2007. See Letter from C. Harris, dated August 4, 2006, at 1, attached as Exhibit D to Solomon Decl. Defendants' counsel later wrote to the arbitrator asking that the hearing be put off, as an unidentified "key witness" had a conflict that could not, apparently, be resolved in the 10 months before the scheduled hearing date. Id. Defendants' counsel also asserted that earlier dates would not work either. See Letter from M. Tsatalis, dated August 3, 2006, at 2, attached as Exhibit E to Solomon Decl. As a result, the arbitrator moved the date of the hearing to July 26, 2007. See Letter from C. Harris, at 4 (Exhibit D).

Shortly thereafter, Defendants took advantage of Elwell's medical condition to achieve another delay. Last summer, Elwell's obstetrician instructed her not to sit for a deposition until a particular date, after which she would no longer be at risk of premature labor. Defendants jumped at this opportunity, insisting that *no* discovery occur prior to Elwell's deposition. They demanded this stay of discovery despite the fact that the schedule that the arbitrator had set permitted sufficient time for discovery both before and after the date Elwell could safely be deposed. See Letter from I. Sunshine, dated August 23, 2006, attached as Exhibit F to Solomon Decl. Defendants nevertheless demanded that the case be stayed for the approximately two and a half months until Elwell could sit for a deposition. This demand led to yet another round of negotiations and conferences with the arbitrator. While the arbitrator ultimately permitted paper discovery to proceed, Defendants succeeded in preventing *any* depositions prior to Elwell being

medically cleared. This delay in depositions was then used as the basis for revising the entire

case schedule, and pushing off the hearing date once again. The hearing was moved from July

26, 2007 to September 24, 2007, over a year and a half after this Court ordered arbitration. See

Letter from J. Ibarra, dated August 29, 2006, at 2, attached as Exhibit G to Solomon Decl.

Next, Defendants sought another postponement, which has resulted in the hearing being

put off for an additional five months. Elwell's case is now not scheduled to be heard until

February 2008, two years after this Court ordered arbitration. Defendants' basis for this latest

delay is that Marina C. Tsatalis, one of Defendants' lawyers, is scheduled to give birth in August

2007, and to take a maternity leave until January 2008. Defendants demanded a further five-

month postponement so that Ms. Tsatalis can serve as lead trial counsel. They made this demand

despite the fact that at least six outside counsel, including one lawyer more senior to Ms.

Tsatalis, have participated in this case or made appearances on behalf of Defendants. The

primary justification Defendants offered for this latest demand for a postponement was that Ms.

Tsatalis had served as lead counsel for Defendants and had taken and defended most of the

depositions in the case. The disingenuousness of Defendants' position in this regard, however, is

exposed by the fact that Ms. Tsatalis took and defended almost all, if not all, of those depositions

*after* learning that she would be on leave at the time of the scheduled arbitration hearing. Thus,

even if Ms. Tsatalis was uncomfortable informing the arbitrator and Elwell of her impending

leave any earlier than she did (March 2007), she could have arranged for someone else to take

those depositions. Instead, with full knowledge that she would not be available for the scheduled

hearing date, she opted to take the depositions herself. Having made this choice, Defendants

should not now be heard to argue that Ms. Tsatalis's role in depositions makes her indispensable

for the hearing. Furthermore, even in March 2007, when Defendants informed Elwell of Ms.

17

Tsatalis's pending leave, there remained a full six months before the scheduled arbitration hearing, which is certainly sufficient time for another lawyer to prepare to serve as lead trial counsel. Defendants' demand for a further five-month continuance was thus yet another effort to delay the proceedings as long as possible. Nevertheless, just this week, the hearing was postponed until February 2008 as Defendants had requested. See Email from J. Ibarra, dated April 16, 2007, attached as Exhibit H to Solomon Decl.

Nor do these efforts at delay represent the only ways in which Defendants have acted contrary to the purposes of arbitration. As the Supreme Court has stated, "by agreeing to arbitrate, a party trades the procedures and opportunity for review of the courtroom for the simplicity, informality, and expedition of arbitration." Gilmer v. Interstate/Johnson Lane Corp., 500 U.S. 20, 31 (1991) (internal quotation marks omitted). Yet Defendants have not only endeavored to impose a litigation-like timeline on this arbitration, but have also invoked all of the procedural devices of litigation. For example, Defendants have repeatedly demanded that the arbitrator apply the full panoply of procedural rules applicable in California civil actions. They have gone so far as to threaten to file papers in court to have those rules declared applicable. They have even asked that the arbitrator stay the arbitration while they seek such judicial intervention. See Letter from M. Tsatalis (Exhibit E). Similarly, consistent with their demand for all procedures applicable in court, Defendants have sought, and received the arbitrator's permission, to file *both* a motion to dismiss on the pleadings and a motion for summary judgment.

Defendants have used other means as well to drive up the expense and burden of the arbitration. For example, in addition to the depositions they had already taken or noticed, Defendants demanded to take the depositions of 18 of Elwell's or her husband's family members

and friends, unless Elwell would agree to certain stipulations.  Those depositions would have

brought to 27 the total number of depositions by Defendants.  Defendants made no claim that

most of these persons had any first-hand knowledge of the events at issue.  In fact, for 17 of

these 18 persons, Defendants' demand was based *solely* on the fact that Elwell or her husband

(who is not a party to this case) had discussions with them about this action or its underlying

events.  Defendants offered to "forego" some (but not all) of these depositions if Elwell would

agree not only to refrain from calling them as witnesses at the arbitration hearing, but also not to

permit any of her witnesses to so much as "make any reference to" or "rely upon" these persons

"for any purpose."  Despite the arbitrator having set a date months later by which the parties

were required to exchange witness lists, Respondents thus sought to coerce Elwell to choose

between making one-sided, premature commitments about her witness list, and incurring the

wasteful burden and expense of 18 more depositions.  In the end, when the arbitrator permitted

Defendants to impose this choice on Elwell, Elwell was compelled to commit prematurely to

excluding 15 of these 18 witnesses, so as to avoid the unnecessary and wasteful costs of their

depositions (not to mention the harassment of her family and friends for no good purpose).  See

Stipulation Regarding Exclusion of Witnesses and Evidence, attached as Exhibit I to the

Solomon Decl.

The effect of Defendants' efforts has been to delay and drive up the costs of this

arbitration unreasonably, and to create a level of procedural complexity virtually identical to that

in most hard-fought civil litigations.  In short, Defendants have sought to impose a timeline

consistent with, and otherwise treat the arbitration as the equivalent of, a civil litigation, while

simultaneously depriving Elwell of the benefits of a judicial forum and a jury trial.  Such conduct

is entirely inconsistent with an invocation of arbitration rights.  Thus, to the extent the Court

19

concludes that this case was subject to arbitration, Elwell respectfully submits that any such rights have now been waived by Defendants' conduct.

## VI.  CONCLUSION

For the reasons given herein, Plaintiff Christina Elwell respectfully requests that the Court lift the stay and allow this action to proceed on the merits.  Elwell also respectfully requests a hearing on this motion.

Dated:  April 19, 2007

CHRISTINA ELWELL,

By her attorneys,

s/  Joshua L. Solomon
Ira K. Gross (IG 6834)
Ilene Robinson Sunshine (IS 2935), *pro hac vice*
Barry S. Pollack (BP 4039)
Joshua L. Solomon (JS 5848), *pro hac vice*
SULLIVAN & WORCESTER LLP
One Post Office Square
Boston, MA 02109
(617) 338-2800 (phone)
(617) 338-2880 (fax)
igross@sandw.com
isunshine@sandw.com
bpollack@sandw.com
jsolomon@sandw.com